Good morning, Your Honor. Craig Sherman, attorney for appellants, Citizens Legal. May it please the Court. Plaintiff is a group of citizens, homeowners, recreationalists, that use a section of the Colorado River. The old section, it's the state lines between Colorado and the states of Arizona. They seek, by their action, to use a 12-mile stretch of the Colorado River, which the government is allowing to impermissibly be abandoned and demised. We believe the record is clear as to the state of affairs on the river, as far as the diseased fisheries, the lack of ability to get boats through areas. And the issue is whether the actions of the government have been unreasonably delayed and not instituted as promised as part of a plan that was put into effect. When's the last time the defendants did anything to comply with what you contend are their obligations? There was a period of time, I believe at least two instances in the last 25 years. I can't come up with a date where they dredged the most southerly portion of the channel so that boats could get into the old river channel from the Walters Camp, southern section. And there was two times the river has been dredged in that area. It was an affirmative act. It was taken, as this record reflects, it was taken in response to the agency's going to continue with its commitment to those mitigation and recreation and resource conservation values that were part of the plan. That was, I believe, early 90s. It wasn't that far off. The reason why did they undertake any physical alterations, not just at the bottom from dredging, but to the canals, to the culverts, or to anything else as part of their attempt, now abandoned, to do anything to fulfill their obligations that you claim they have? They have not, in that instance with regards to the dredging in the Walters Camp area at the southern part of the river where to get boats into the channel. There was attempts in the, raised in the briefs, with regards to trying to ameliorate or correct and implement the measures at three fingers length. And in that instance, there was discussion in the plan of reports to finally institute those actions. There was discussions of bringing in culverts of the fresh water that were so integral and important to the project at its inception and these measures. And they did some action to construct that, but without the fresh water. And that project was ultimately unsuccessful as we presented in the brief. That was also in the latter phase of the 90s. But the demise of the abandonment of the fish and wildlife values were legal duties and commitments. These aren't things that clear appellant in this case is making up or pulling out of a hat. They're part of committed measures that were part of a plan. And if you look to the cases that, for reasons that the district court dismissed the case, some rejected it, it was based upon, well, this is the challenge of the original construction and the original plan. And you're just too late in bringing the challenge. But if you look to the plan itself, the measures were incorporated in the plan. They were intentionally committed. They were deferred in a manner that the agency couldn't do them then, wasn't going to do them then. Putting them off later made more sense. And the record's very clear of reasons for the deferral and the continued commitment and obligations to do them. If you were to get the remedy or remedies that you seek, would any of the construction that's now done and was done originally, would any of that have to be redone or modified? It is not our understanding that it's a matter that would have to be studied within the agency's discretion of how to implement the measures to ensure the conservation values. But as far as the aspects of the project to reroute the river, absolutely not. The point of routing, the flows, they might have to reconsider elevation levels. But those are design and implementation measures, not so much as the conception, the intent, and the purpose of the project. The reason I'm asking that question, you can probably tell. If you've lost your statute of limitations right to challenge the construction, which is what the district court held, and I'm not sure how I view that, but if you have, I'm trying to figure out then, well, what remains then that you can get as a remedy if what you're challenging is the method in which they're operating the system. How much do they have to go back, if any, to change the construction that the district judge says you can't challenge anymore? Can you help me understand what's going on in that respect? I would not view that as changing the original construction as much and as much as it's implementing the mitigation measures to achieve the conservation and use perspectives that were contemplated by the plan. The point being that the matter would have to be studied to see how to implement and attain some level of use goals that was intended by the promises and intent of the plan. We don't know, as we sit here today, what changes could or should be incorporated with regards to implement those measures because time has passed and it's been deferred for so long. The record of the government states that we've over-dredged in their original construction plan, created problems in and of themselves to be able to implement these measures, and that's one of the reasons they were deferred and put off, and that's why we're here availing ourselves for the courts today. When did the government finally make it plain that it simply wasn't going to undertake any further measures to comply with what you contend were its obligations? There is no finite date. As the record plays out, an appellant points to two dates in 2003 and 2005 in reclamation letters, and I can read from the quotes at pages 704, excerpts of record 373 and 384, but there's an equivocation. It's, we can do things, but we might not. The statements of, we lack jurisdiction to do it, that's the irrigation district's problem. And the question before this court and the authority's support is, how long must an appellant or a party wait to bring its action? If there's unreasonable delay, and that's the purpose of a failure to act claim under the APA 7601. If it's the cases of a public citizen health research group cited in our briefs, and there's the environmental defense fund versus Hardin case out of the D.C. circuit, you talk about unreasonably held, to quote that language because it's better stated. It's a case where administrative inaction is the equivalent of an, inaction is the equivalent of an order denying relief. But the records as far as particularized dates, we believe at least in 2003 and 2005 shows that they're trying to pawn off or displace jurisdiction to the irrigation district, and the fact that the conditions are such at a level that a plaintiff and an appellant can wait no longer beyond the point of, you know, a no reasonable point of return. And how long should an appellant have to, or a claimant have to wait to bring an action? You have to do something here. You either need to recognize the original duties that you're abandoning and you're not going to do, or instate that, and you have the equivocation here. Well, if counsel, the California Fish and Game Code provision that you're relying on, 5973, applies through Section 8, and it involves, I'm assuming, some diversion of the waterway, which may or may not involve additional construction to increase the water flow the way that you, I'm assuming, claim to be compliant with that code provision. How does that affect the rights of Arizona? Could reconstruction potentially negatively impact Arizona's interest in the Cibola Cut? We contend that they would not. First of all, the water rights that were inherent in this area prior to the construction of the project are the type of vested rights that the project and the government and the report and plan to construct it said were not going to be affected. So there's sort of water rights, water was there originally. Number two, there was no intent to affect those rights. This project is a non-consumptive use basis, and that was at the original inception, as well as even in more recent times, that this project is supposed to be a non-consumptive basis, so it's water passed through. So from a water right perspective, it's a non-issue, and I think the government would admit that from the perspective of it's a non-consumptive case. Well, you're relying on Section 8 of the Reclamation Act, and that provides that the secretary must comply with state law unless state law is inconsistent with congressional directives. Right? Pretty water lippy. Now, um... You know, this is a complicated project, you know, and do you have a diagram of all of this? I believe there is a diagram of the... Well, I mean, we have the diagram here of the river, and we see where the diversion took place, and how it all comes back together again at the... ...enters the new channel. This is what you're talking about? Yes, Your Honor. And that's a modern mapping of the area as opposed to the original plan. I believe there are some more schematics that show in different sections where the original dry cut was going to go. But the question Your Honor's posing is how would I map out or diagram what would be the hierarchy or sequence of clear legal claims? We have a Section 8, a Reclamation Section 8 Act claim for the purposes of saying that, look, the state's consideration in this project was significant. They were important. They were consultations conducted under the Fish and Wildlife Coordination Act. This was before the inception of NEPA, Endangered Species Act, Clean Water Act, where we would have had innumerable agencies and state reviews and public hearings and testimony and federal register notices. That's important. We had in 1959 what was best available for our country to preserve these resource values, and it was implemented. If we look to page, the premise of this project at page 233 of the excerpt, just to get the flavor. So we're operating under that act. We have the consultations. We have everybody's in sync. The Secretary approves this project after all these considerations with these measures. It was a multi-use project. It's not an agricultural frame. With that said, Reclamation Act Section 8 provides that type of state considerations in the project. But the project also clears claim also has another problem, and that is straight APA with the failure to act with regards to this project, unreasonably delaying compliance with its own project. Well, to state a claim for failure to act under the APA, you need to show that your claims are timely, that Reclamation has failed to take a discreet action. And Reclamation, talking about the Bureau of Reclamation, and the third item, I think I mentioned that here too a moment ago, was legally required to take this discreet action. Now, are those three items maybe satisfied? Yes, Your Honor. Timeliness, discreet action, failure to do that, and the legal requirement. Yes, Your Honor. Our response is that plaintiff and appellant in this case happened at each of the prongs for an APA action under an ordinary accrual standard. But my first discussion has been along the lines that these were discreet actions. These were adopted as part of a plan and a project. You don't see that in the other cases. If we take Norton v. Southern Utah Wilderness Alliance case, the Seminole Sioux failure to act APA case. Well, in that case, the Supreme Court's noting under the facts of that case that, look, they haven't adopted anything in their plans to enforce yet. However, if they did have something in their plans and there was something to enforce, it would be a proper APA case. And I can give you the peace side on that. So we have the discreet actions. We have the failure to act under ordinary accrual standard at some point. When plaintiff is aware of the wrong and can successfully bring the cause of action, this is a very unusual case. I went back and reviewed every case I could find under APA 5 U.S.C. 706, Claim 1. And the cases are not very opposite. They're where somebody was trying to enforce a provision in a plan that just isn't there. But we have those provisions in this plan. Let me ask you this if I can. This is just kind of a practical question. We've got this cut. How do I pronounce it? Cibola? Cibola cut. It's a dry cut. So the Cibola cut's the new cut that's gone down that's relatively straight. And it diverts a lot of water that otherwise would have gone down this channel, the old river channel. And I've seen this kind of picture from the video when I got the chart. Some water comes in from the PVID outfall drain below pretty water. So we're getting some water coming in there. We're getting very little, if any, water coming in at the point where the diversion dam is. Is there any water coming through there at all, above where the PVID outlet drain comes in? The record's equivocal. At first, the federal government stated, look, there is no water getting through that. And now they're claiming sort of percolation through the... Correct. Okay. But... No, no, no. Okay. And then the cut comes back into the main river. Is there any water diverted from the Cibola cut for agricultural purposes? Or is that just a straight pass through that's a little straighter than the old river channel? Your Honor's referring to not the new cut. It's coming down from the north out of the town of California. Oh, I know about the cut. The cut that starts just above pretty water, at pretty water, and then it comes back in just below Walter's cut. Okay, that's the Cibola cut. Now, I understand one of the purposes of that was just to make it straighter, worry less about what may happen with floods, worry less about sedimentation, worry less about, I guess, all of a sudden an avulsion and you're paid an octopo. I guess they had their reasons. But what I want to know is, is there water being taken out of the Cibola cut for agricultural purposes? Are there any drains that come out of it, any agricultural ditches? Certainly to the north in the Talaverde Irrigation District where there's farmlands. To the south, the water's through the- No, no, I'm talking about the cut itself. Yes. Yes, from the cut. But the cut is, that's a man-made channel. It's a major channel. And it's concrete. Boulders, riprap, I'm not sure it's concrete, but yes. What? I do not believe it's concrete. What is it? It's cut through the desert. I believe it's sediment side channels in the Cibola cuts. That's the cut, the new rerouted river through the desert, which is flowing with the Colorado River. But what I'm really driving at, I'm trying to figure out whether we're talking about anything other than just how the water gets from above the cut to below the cut, whether it goes through the cut itself or whether it goes through the old river channel. We're not talking about using water for anything other than simply flowing past the plaintiff's properties. They're not going to use the water. They're not agricultural users. It's just riparian users. So your point is, listen, we're not increasing or decreasing the usage of the water. This is purely a matter of riparian rights. I want to have water in front of me that has fish in it, that moves along, that's deep enough that I can use my boats on. Is this right? Yes. So we're not talking about taking any water out of the river. It's only a question of where the river goes. Where the river goes is how it goes from the top of the cut to the bottom of the cut, how much of that water goes through the cut, and how much of that water goes through the old river channel. Not exactly. It's complicated by the fact that the most northerly port of now feeding into the old river channel is an agricultural drain, water that drains from the Palo Verde Irrigation District. So there's sort of the PVID, RCI, coming in. But it's not purely... It's supposed to be purely agricultural drain water, but it flows at approximately 50 CFS. I could be wrong. I don't think it's 500 CFS, cubic feet per second. There's a flow, but that is the principle, and only water now flowing through the old river channel. Right. And that water coming from the PVID outflow drain, that's going to get into the Colorado River at some point, whether here or otherwise, it's coming to the river. Correct. It's absolutely flow-through, and I'm not sure... It hasn't been a part of this case to know whether that's allocated water, some other allocated water users down... But it is passed through, and it is being used to maintain... Well, every drop of the water is allocated. Correct. It's accounted for. From the source to the last drop. And your point is... Your clients are not asking that they are allowed to take water out of the river. They just want to have the water... They want to have more water coming past in front of their properties. If there's not sufficient flow-through water levels, there'll be... I think the answer to my question is yes. Yes. Okay. And that gets back to my original question, because unless I'm missing something as I view this photo or this depiction of how it works, diverting water to increase flow through the original river channel might then dry up another portion, for example, along the Cebola Cut somehow. Engineering-wise, I'm not sure how this can be done in a way that doesn't effectively negatively impact, for example, Arizona residents. I don't know this to be the case, and I don't... It was unclear from the record as to whether there are now developments and water rights on the Arizona side along the Cebola Cut or other areas of the river. So explain to me or sum up your argument for me why law of the river doesn't apply in this particular case, because it's very clear from California versus the United States and Arizona versus California that this is a very complex area of federal regulations, and there are, in many instances, competing interests at play here. Yes. Thank you, Your Honor. It's an important question. Let me start with what you first started with, and that would be what is the fix, and how might that affect the project as originally conceived, or how that might affect other users or other water owners or other water rights or riparian rights, whatever rights they may be. Well, my first comment is this is a mess that Reclamation created upon themselves when they constructed it wrong, and they admitted that we're going to need to fix it, and we're not going to give up on these measures. That's critical. So they need to study. They need to figure that out. If we look too well, this might affect water appropriations under the Law of the River Doctrine. Unlikely. This case is a non-appropriation case. It's a non-consumption case. Matter of fact, the conditions now, as the experts and the evidence that we presented at the trial court was, allowing the slow river moving and the breeding and the siltation, the evapotranspiration, is an incredible waste of water. It's one of our claims. It's unreasonably waste and use of water. So that's the government's facts and statements in the record as to that waste of water. So if anything, this is a water savings project. So it doesn't affect the Law of the River water allocation rights. And as our brief pointed out, the way that the Reclamation Act Section 8 interfaces with Law of the River Doctrine, it's not inconsistent. It doesn't need to be inconsistent. The only way that there's an inconsistency here is the way that it's presented by defendants in their brief as to we just can't do it because it's going to complicate things and interfere. It doesn't need to. It doesn't have to. But the way the consumptive and water rights are and the nature of this project and the commitments to this project. Help me understand a statement that you made that the way things are now set up is a waste of water. I think I understand what you mean, but I want to make sure I understand it correctly. That somehow having this relatively stagnant old river channel is creating more evaporation and wasting water. What do you mean when you say there's more wasting water? Help me understand that. That's precisely the point. And the term waste within water conservation parlance is just it's not being used in an effective measure. And in this case, out in the desert, the very hot areas and the very shallow grounds, it super heats and evaporates more quickly. And that also makes it unusable and demises the fish. So there's sort of a three-tiered issue. So you're telling me, and I guess this could be borne out or not by extra testimony, if you had a more rapid flow through there, the water would stay cooler and wouldn't evaporate so much. Precisely. That's what this record calls out. So why was the Chabola cut? Why was that constructed? For what purpose? It was ultimately deemed a multi-use purpose project, but it was primarily for the purposes of lowering some water tables, and as Justice Fletcher mentioned, presumably to help rectify, prevent floods a little bit, to have a more freely flowing river. But primarily it was a project pushed by the Irrigation District to get the water table lower so that its agricultural fields in the Imperial, not the Imperial Valley, this would be the Palo Verde Valley, would drain better. They could get the table lowered and they could get the flow better off of the fields and they could do better farming. And that makes good sense. The issue was it was overdredged. They didn't implement the measures. And now you have the mighty Colorado River between the states of Arizona and California being relegated to a drain with none of the measures being implemented as they promised by the project. With none of the what? With none of the mitigation measures, the resource conservation measures, the consultations between the states under the Fish and Wildlife Coordination Act that were made part of this project. That's what makes this case so different from the Wind River cases, the delayed accrual cases. There were mining regulations that went into effect and you just don't like what they were. Or in this case, we like what they were. We just want you to step up to the plate and do what you promised you would do. If not, reconsult and tell the world that you're going to let the river dry up. Because the laws in our country are that we do consult. If we're going to change plans and throw away mitigation measures and not do the things that you said you were going to do, there needs to be consultations and accountability. And maybe if you took away the water altogether, you might owe some compensation. There were promises in this record, it spells out that the riparian landowners would have access and use and there were no severance damages awarded in this case because they were going to keep it open and keep it functioning. But if they'd simply taken all of the water away, all of the water, and sent it through the new cut, and all of a sudden, instead of having a river rock property, I've got a desert property, I assume some compensation. I assume there's a takings claim at that point. But there never was one because there was the promise you'll have the water. Based upon the record of defendant agencies own admissions, that's correct. Yeah. Okay. Well, was there a problem in the old system before the Ebola cut was made? Was there a problem with silting of the river? It was a natural river, so it did meander, it did move around during flooding times, it did create floods and oxbows. So I think sedimentation is always present in a natural river, it does move around. But the Colorado River and these use areas were always that, it's a big enough river and well enough to be used throughout eons and generations. And at the time of this project, the resource values and use, it was relatively stable, but it was a natural river before the main channel was moved. So you're saying the reason for this Ebola cut was to satisfy the farmers in the downstream? Upstream. Upstream, okay. So you lower the level of the river higher up the river, you lower it faster, which means that their water will drain off their fields and through their drains faster and easier? That was the point of view from the farmers? Yes, sir. Thank you very much. Thank you. Good morning. My name is Ellen Durkee. I'm with the U.S. Department of Justice. I represent the Bureau of Reclamation. At Council's table, I have with me David Saunders, who represents the Palo Verde Irrigation District, and I will try to save him a couple minutes at the end. Well, what did the government, Bureau of Reclamation, promise these folks? They didn't promise these folks anything. Didn't promise them anything. What you have... Before they're getting the idea that there were promises made to them, that this old channel would be kept open, that they'd still enjoy the use of the river with their boats and all that. Is this a fiction? I think it's a fiction that cannot be traced to any particular statute, plan, anything. If you look at the original plan for the Cibola Cut Project, it is very clear that the water that was going to remain in the old river channel is limited to the water coming out of the Palo Verde drain, which is about 500 CFS. It was never in the plan. It has never been the case that there was going to be a diversion outlet and send Colorado River water through the drain. They have, in recent years, decided because of the way things have evolved that they would like... Is this your diagram? Yes. This is your diagram? Yes. It came from an attachment in our district court briefs, and I included it in my brief on appeal. The farming community is north of the cut. Right. I believe that the Palo Verde Irrigation District is north and west of the cut, so it's in California. The one thing I think is important is that starting in 1964, almost all the land around the old river channel, which is what we're talking about here, is now a National Wildlife Refuge. Which land are you talking about, Johnson? Well, it's the blue... On the west side, it's the blue crosshatched, and then there's also... The Wildlife Refuge is also on the Arizona side. So basically, all the crosshatched red and blue on the map. All the crosshatched red and blues. Well, how about the blue areas, like where the creek... Finger Lake is. I'll confess, I don't know what the blue, underlining blue-blocked area is. You know, I'm sorry to interrupt. Help me out. For some reason, I've got black and white. Where do I look in the excerpts and so on to find the color? If you... I don't know how it was printed out by the court, but my brief at pages 11, I believe, had a color printed picture. Okay, this is your brief, and it's black and white. I don't know how those guys got color. I got cheated. Yeah, you got chipped. We got the colored ones. If the court would like, I can bring up a copy of it here. Okay. I'll look on and just... All right, and my apologies, if I contributed a little. Well, you know, I got where the blue is. You know, you don't make it easy on us. You know, that's part of your job, to make it easy on us. We have 35 appeals this week, tough ones, and you need to... When you make a presentation, you have to make it so it's clear. You have to have a diagram that's clear so we can grasp this. Do you understand what I'm saying? I understand what you're saying, and I'm sorry if I'm being unclear, but I think what I'm trying to... I think this case does not need to be as complicated about who said what to whom. I think you have to... This is a look at where could there possibly be a duty to do what these folks want, and my frustration, to be quite honest, is I don't know what they think if the remedy is here. I have never had a failure-to-act claim where the plaintiff could not tell me what it is, the action that they wanted to take. Well, we get that all the time from lawyers that get up there and talk to us for a long time, and we ask them, well, what do you want? They can't tell us either, so you don't blame these people, you know? All right, then I will tell you what my understanding of what they want is. I think they want you to read the original plan as having some kind of amorphous conservation value. It's not in the plan that was not part of the purpose, but even if it was, that does not create a discrete action that you need under SUA. They have then pointed to those 13 mitigation measures that were included from the consultation with the Fish and Wildlife Service. As we've explained in our brief, through the construction and through further consultation with Fish and Wildlife Service, some of those measures were changed. That is exactly what is contemplated by the Fish and Wildlife Coordination Act. What we do know is that by 1976, 1977 and there, they were done with this project and the mitigation for the project. And they are dissatisfied with how well the mitigation may be done, but that is when the statute of limitations to complain about how well it was done started occurring in our view. The statute of limitations for a claim that they must now divert water through the old river channel accrued from the get-go because that was never the plan. The other issues that they have brought up are dredging. They said that there has been dredging in the past. Again, you will not find anywhere that provides the source for a mandatory legal duty to do that. Instead, Reclamation's position has always been and continues to be, it has some discretionary authority on this huge project that goes up and down the river. But that is different than saying they have a legal obligation to do certain things at certain places for the benefit of homeowners along the river. The dredging was... If I can, I understand your point that there is no contractual obligation based upon what was in the original plan in terms of mitigation. You are saying there is no contractual obligation. And I don't think they are saying there is a contractual obligation either. What they are saying is that under Section 8 of the Reclamation Act, you have a duty to comply with state law. And among those state laws are Section 5937 of the California Fish and Game Code and Article 10 of the California Constitution. Both Article 10 and Section 5937, I will paraphrase, but they both talk about beneficial use and so on. Are you saying that the beneficial use requirements of both the statute and the California Constitution are so incomprehensible that you don't know what you are supposed to do? Is that the argument? There are two arguments. The first argument, and one the district court did not reach, but I think it's an important argument, is that the lower Colorado River is controlled by the law of the river. It is controlled by federal law. Yeah, I know. I'm putting that to the one side. Pretend I don't understand that or I don't agree with it. Next. Then if we assume, for the sake of argument, as the district court did, only for the sake of argument, that Section 8 applies, our position is that none of those California statutes on which they rely provide the kind of mandatory duty that is necessary to support a 706-1 claim. Now, are you saying that because there is no duty or because the duty is so general? Both. Why do you say there's no duty? We say there's no duty because those state statutes can only apply under Section 8, and Section 8 applies only when the agency is carrying out some kind of activity, and I think the district court had it right here, and maybe if I could explain it in a different way to make it clear. I think what she was correct about is that this is a passive project that was constructed. It has an end. In terms of... So there's no more carrying out of the project, per se. When the project was built... On the other hand, you say in your own brief that you operate and manage. You're doing stuff, right? I mean, it's your obligation to operate and manage. So the question is, how far does that obligation, the current ongoing operation... I mean, it's not as though you just said, we're out of here, we have no obligations. So I'm not sure I understand what you mean when you say, we've finished. What I'm saying is, this was a project that had certain criteria. At some point, that project and those criteria are done. The statute of limitations started running to complain about how well that was done. There is also an ongoing... You're right. This is an area that you've got reclamations, got a project running through it, you have a fish and wildlife service, wildlife refuge. Things happen in this area through management. The reclamation tries to be a good neighbor. It does have some discretion to do things. So when he was asked, what has reclamation done recently? Well, they fund through a contract with the Fish and Wildlife Service to try to address some of these non-native invasive species that are much of what they've complained about here. So... But the question is, just because they're helping out with non-native invasive species, they have all sorts of involvement, a multi-species conservation act from the lower Colorado River and so on with the Fish and Wildlife Service. Those do not give rise to any... You're talking about species. What are you talking about? What I'm trying to say is, okay, so they go out and they help out with... Fish? Fish, I mean with weeds. Weeds. But that doesn't give rise to... Non-invasive. That's an invasive... What do you call that? I'm sorry. Non-native invasive is what I'm saying. So that's how you call weeds. Yes. It's got the big names after it. Not a weed, but... Non-invasive something species. Okay. Right. Non-native invasive species, they have helped try to address that. But that does not give rise... But I think you have to look at that activity. Is that an activity to which state water law applies? I don't think so. State water law is looking at water use, appropriations and diversions and so on. And I do want to make it clear, two things about the law of the river so that we don't walk out of here with lack of clarity on this. We do not agree with the statement that diverting water into the old river channel would be non-consumptive use. The California Water Board, the Colorado Water Board of State California has said they believe it's a consumptive use. In order to be a non-consumptive use, you would have to return exactly... You can't let any amount of water disappear in that diversion. And, you know, I'm told that's not really possible. It goes into the aquifer and so on and so forth. But regardless, I mean, we can dispute that. That sounds like a factual question. What did you lose on the factual question? Let's assume for the moment that you do. I'm not saying you will, but let's assume that that's attested. We have expert testimony and he wills. That was going to be my second point, but it does not matter. You got to get rid of that word consumptive, huh? Because when I grew up, I had tuberculosis, you know, gut consumption. So now it's drinking water. Right. And it doesn't mean people consuming, by the way. It involves all sorts of ways that water disappears. But my point is it doesn't matter whether you categorize it as non-consumptive use or consumptive use. The decree that the Supreme Court has in Arizona versus California applies to non-consumptive use. They are absolutely legally incorrect that it only applies to consumptive use. And it also applies to all diversions. So even if you said, you know, even if we accepted and they could get all the water back in the river that they diverted off, under the law of the river, people can't just simply divert water off. That is not allowed. It has to be approved through the mechanism of the law of the river, the federal. But that's your point, that Section 8 doesn't apply. Right. I may read the cases differently. Well, actually, there's two points, I think, to clarify. Law of the river, it doesn't apply to this project because of the law of the river. And secondly, we're saying that, leaving that aside, Section 8 isn't the kind of law, federal law, that provides the kind of discrete action in this case where they're not carrying out anything that has to do with these water laws. So the one, the latter argument is the preface to our discussion in the brief about California statutes. I guess, okay. The point I think that's important to understand here is that what we have here is not an agency that said, we don't want to do anything, we never do anything, we haven't, you know, or anything like that. Well, the point here is that Reclamation has enough discretion over what it does and how it decides to maintain this huge system that traverses many states, it's very complicated, and it can decide when and how to maintain and how it wants to do that. It can't, there is no discrete mandatory duty here to do particular actions and whatever they think that they would be. And that's why they lose in this particular case. Say that again. There is no mandatory discrete duty that can be identified that would allow them to have a cognizable claim in this case. Now, let me make sure I understand what you're saying there. I think, and I'm trying now to state your position sympathetically to you. When you say there's no discrete duty that they're required to do, it's because even assuming that Article 10 of the Constitution, even assuming that 5937 applies, they're so vague that it's not a discrete duty that would then trigger the right to action. Is that what you're saying? That is correct. It's the same kind of duty to maintain for wilderness characteristics that was at issue in SUA. Even accepting there was a duty to attain objectives, these broad sort of hopes of things, the SUA case would tell you that those, that's not specific enough because it's not telling you how, at least with the agency discretion as to how to do that. And the Supreme Court said when they have discretion as to how to do that, then there is not a sufficient basis for a 706.1 claim. Well, when you say not sufficient, when we talk about, well, you're talking about the Administrative Procedure Act. It would require clear to show that its claims are timely, that reclamation has failed to take a discrete action, and reclamation was legally required to take the discrete action. That's what you're talking about. Have you ever diagrammed all of this? Diagram, D-I-A-G-R-A-M. Have you done that in this case? I have not done it. I'm not sure what kind of diagram you're referring to, but no. Here's one right here. Takes hours to put it together. And you're the one that knows all this stuff. But you just throw these words around. We've got to absorb all of this. Now, what I'd like you to do is diagram your case for us in a diagram like this. Do I have your permission to submit a diagram after argument? Yeah, sure. I mean, here, I've got up at the top, Section 8 of the Reclamation Act. Then another part here. The stated claim for failure to act under the Administrative Procedure Act. Those are the two basic things, right? Is that right? I'm sorry. I only heard the failure to state it. The 7th failure to act. I didn't hear what the other second claim was. Well, up here at the top, I've got Section 8 of the Reclamation Act. Provides that the Secretary must comply with state law unless state law is inconsistent with congressional directives. Right? I don't have your diagram, so I will take it. No, no. Isn't that what Section 8 requires? It requires the Secretary to comply with state laws having to do with acquisition of water rights. Reclamation owns no water rights on the Colorado River. Unless the state law is inconsistent with congressional directives. That's Section 8 of the Reclamation Act. Right. And the Supreme Court held in Arizona v. California that Section 8 on the Colorado River only applies to that first part, the acquisition of water rights. That's why we need your expertise to give us all these little details. You know what I'm saying? Right. I believe it. I mean, I've got cases where I've traced every drop of the Colorado River water from the beginning to the end. Takes a long, long time to do that. Months to figure all that out. So that's what I want you to do. To give us a chart, a graph, something visual that we can just see how all these things come in and fit. And if there's a case out there, a Supreme Court case that changes what the statute has to say, or conscrues it and causes it to tack in a different direction, you could tell us that. I mean, you're the expert, aren't you? I don't know what else to say, Your Honor. I've done my best. I will try to do what you ask. Do better. Do better. I may, like Reclamation, not be satisfied with my best effort. But I will do what I can. Well, have you done a diagram like this? I don't know where. Is that diagram from the record? No. I created it trying to figure out what's going on here. Maybe you can create one since you know all this stuff. This is maybe my third or fourth Colorado River case in 40 years. But you're splashing around in that water all the time. If the Court has no other questions, I'll stop there. I have a different question for you. If the agency engages in action like this, from a practical perspective, drive out water for the homeowners living along and enjoying the uses of a particular section of the Colorado River, at some point does a takings claim arise? And I think part of Claire's point in this case is because of the promises or understandings that they have with regard to mitigation measures being in place, it's hard for them to know when to bring in action in that circumstance. How do you analyze that issue? Well, I would analyze it this way. They knew in 1959 and 1960 when the plan was adopted, they knew that the Colorado River water was no longer going to go past these private ownership. They knew again in 1970 once it was constructed and the water began flowing through. So I don't think there's a takings claim here at all, although I don't have at my fingertips some of the aspects of the project statutes that would help show why that is. But I do know that the statute of limitations on a takings claim because there's no water where they used to have the entire Colorado River going by and they no longer do, that would have been obvious 40 years ago. So any kind of takings claim based on that should, the statute of limitations should have run long ago. I would also point out that what, you know, what has happened as a result of this project is that a wildlife refuge was created and so there's all this pristine, I mean they don't consider it pristine because it's for wildlife. It's marshy. That's what wildlife like. But there is undeveloped land surrounding these private homeownerships and so they get some benefit from that. That is probably what they want. But at the same time, this project, you know, you cannot manage the lower Colorado River for the benefit of people's property values so that they can, you know, use whatever kind of boats they care to use or different recreational uses they want to make of the federal property. And so I don't think there's a takings claim when one, you've known about the fact that water's not coming by for 40 years and two, what you're complaining about is the way that you want to use the federal property. I'd like to ask a variation on that question. I take the point on statute of limitations. But it seems to me that if the government is going to take the Colorado River which is at the moment flowing in front of your property and divert it so that it's now going through a channel some distance away from your property that you don't even see and the only water now coming through your property is coming out of an agricultural drain, that you have a takings claim. Do you agree with that? I would not agree with that. I'm not asking you to concede that one can be brought because I fully take the statute of limitations problem. But you say even then there's no takings claim? Well, I'm stepping on some ground that I'm not as sure of, but I believe that in, you know, when you have appropriation water system, you don't necessarily, riparian owners do not have a right to a certain amount of flow past their property. So it's assuming that as a riparian owner, you have a right to a 10,000 CFS river in perpetuity whereas my understanding of appropriative water law is that what you have is if you have been using water, then you create a water right and we have not interfered with anyone's water right. Well, the takings claim wouldn't be that you took water that I could take out, but rather you have enormously diminished the value of my real property. Right, but you have to have a property right that gives rise to dimension. No, you're not taking my point. I'm not saying they had a right to take the water. I'm saying they had a right to the value of their property. And if I've got a piece of property that fronts on the Colorado River that is worth $100,000, and you now take the entire river away from me and give me this shallow little thing that's basically water from agricultural drain and my value of my property has now been diminished as a result from $100,000 to $20,000, I think I've got a takings claim. Your Honor, here's why I do not believe that you have a viable takings claim. They have no right in the river flow. It would be like saying if you have a cabinet... Hold on just a second. You didn't take my point. Of course they have no right to the takings flow, but you have diminished by their action the value of their property from $100,000 to $20,000. It's a so-called regulatory taking but in a water context. Maybe you don't know takings law very well with respect to real property. I'm not talking water. I'm talking real property. I do practice takings law, and with all due respect, I think what you're describing might be say you own an inholding in a national forest. The national forest decides they want to take some management activity on the property next door that abuts your property. I don't think there's a takings claim to say that you have to maintain the national forest in a pristine way next to my property, and if you don't, then I have a takings claim. Okay. Now, and this is maybe an irrelevant lead-up because there is no takings claim now, whether there was one or not. But what I'm after, I'm trying to figure out what the reasonable expectation was as time goes on here. I'm trying to figure out the actions of these people and what did they expect that the Bureau of Regulation was going to do and what might they have right now to require that the Bureau of Reclamation do. And it's pretty clear that they thought they were going to get better than what they've gotten. Now, whether they'd have something enforceable is a different matter, but as I read the record here, they thought they were going to get a better deal than in fact they've ended up with. The natural, I mean, part of what's going on here is a natural evolution of water bodies that are outside of any agency's control or responsibility. Part of why they are, the way I read it, that they're dissatisfied with the water quality that's coming out of the drain isn't as good as it should be. I don't, that's not a reclamation responsibility. It was never, they should have never had any expectation regarding water quality that's being used to feed the ORC. As far as the expectations, I mean, they keep going back to those 13 mitigation measures and if you look at them, none of those talks about being able to drive a boat around. These were mitigation measures for fish and wildlife and what they have evolved into is providing sort of marshland and so on. And that's not what they want, I think. They want open body water to boat in and they want less odor and they want less weeds. But none of those expectations do I see in the record from the get-go. Now, in terms of the dredging may have, you know, like I said, I think reclamation has tried very hard to be, to use whatever authority they could to be a good neighbor. When they had dredging equipment in the neighborhood, they did do some dredging right by Walter's camp so that they could drive their boats out into the river. But that is different than having an obligation. And just because they did it as a service on two occasions does not then make it in perpetuity an obligation. I mean, that's the, you know, no good deed goes unpunished approach. So the other thing I would just like to point out. I don't know if I'd apply that statement, no deed goes unpunished approach to this. The one mitigation measure. Did these people know when this diversion was going to take place that the water they would get would come from the farmlands to the north? They're overflowing. Do they know that? I'm sorry, I didn't hear the question part of that. The water would come from the irrigation lands, yes. They knew that. Is that what you're telling me? Yes, they knew that. They knew the water was going to come right into their area from the Palo Verde, where are those farming areas? P-V-I-D's outfall drain? Yes, the Palo Verde Irrigation District drain. This outfall drain was going to come right into one of their properties. They knew that. Yes, it's in the... The mitigation measure that they have mentioned several times, it's number one about putting a sill in the front of the mouth of where the old river channel and the new river channel meet near Walter's Camp. I just want to point out, I want to make three points if I could and then I'll stop. One, if you look at the mitigation as it's written up by the Fish and Wildlife Service in 1959, what it says is this will provide immediately what would happen eventually. A sill means they're blocking it. That is so they didn't build the sill because, mostly because it was going to back up and not provide the drainage that was wanted. But when it says it's going to happen over time, there was realization that over time there was going to be some sedimentation that would come to that spot. What they're complaining about is somewhat the natural evolution of this process. Secondly, I'll assume for the sake of argument, that was a mandatory duty and that for some reason they, you can wait 40 years to try to enforce that. That wouldn't do, this would not address what they're complaining about. It would block some of the water there but it wouldn't help the water quality. It wouldn't make the weeds go away. It would actually make the flow, you know, even as stagnant or more so than it is now. So, again, I think you have to look at what is it that they're asking for. What is the discreet action that they're asking for? I still do not know. But I've tried to address the various options that they have laid out and told you why I think there's no obligation for those that would allow a 706-1 claim. This is an interstate river, with Judge Gregson's indulgence, but I can just ask you one more question. Mr. Sherman indicated that whatever solution reclamation comes up with in order to grant some relief, there's no potential that it will negatively affect folks on the Arizona side or portion of the interstate river. Do you agree with that statement? You know, it's hard to know when we don't have a proposal. So I'm not, you know, what I'm thinking is that the Arizona side is part of the Fish and Wildlife Service refuge over most of this old river channel. So one of the concerns I have with the direction that they're going is, you have a Fish and Wildlife refuge that has its own aspirations as to the quality and what they want to do with that refuge to make it the best quality refuge they can for fish and wildlife. So reclamation can't just go out and do things. You know, this is, they would have to coordinate with them. They would have to coordinate with all sorts of regulatory agencies. If you say there's a non-discretionary duty to do, I don't know, send water through, you know, build a hole in the levee and send it through and that's non-discretionary, then what happens to endangered species? You wouldn't have to do a consultation if it's non-discretionary. You would just have to do it. And there are endangered species that are, you know, near the top of Calaverde. In fact, I mean, that was one of the concerns about one of the proposals. The sea beach goes into a pond up there that is being used to breed endangered fish. And if you open it up and fish, predators come in and it would destroy it for that purpose. So it's not, it, my point is only that it's very complicated. And the idea that reclamation can simply do whatever it wants out there to, you know, for some sort of broad objective for conservation, it's not really realistic. You have to, it would harm and it would affect other entities and it would need to be discretionary enough that those entities could have some say in it. This is a mechanical or practical question to which I hope you know the answer, but if you don't, no harm, no foul. We're told that the reason the farmers wanted this Ebola cut was that it would reduce the level at which the irrigation water comes in back into the riverbed and therefore increase their flows. And am I to understand that what was really, what's really going on with respect to that purpose is that the water coming down from the outfall drain from the PVID now has a lower end point so the water flows better. Is that what's happening? So we've taken the river out of the old course and instead of having the river that's up at a certain level, because you've taken it out of the old course, we've dropped it down six feet and now they've got better, now they've got better drainage out of the farmland. Is that what's going on? That's what I understand. And that's what, that was the whole purpose or rather the primary purpose? It was one of, I think there were three primary purposes. The other two were being? Flood control. This was a very, I mean it was just a very flat area of the river and it would flood all over the place. And the other one was the sedimentation problems in the main channel that would eventually block dams and so on. The downstream stuff, the sediment would be carried down more. Yeah, yeah, okay. I got it. So to the extent that we put a lot more water back in this, it starts to defeat the purpose of draining out from the Palo Verde. Okay, I got it. Good morning. May it please the court, I'm David Saunders for Palo Verde Irrigation District. We're a state agency. We were sued under state claims only. We were dismissed when the federal claim was dismissed because the court exercised its discretion to dismiss our state claim. I'm here to answer any questions the court has. I would confirm Judge Fletcher's question and that the response was correct, Your Honor. And that is when you lower the downstream, it facilitates and accelerates the drainage of the Colorado River. I'm sorry, of the Palo Verde Valley. But there were other points as well. I understand that further down the river, the Yuma Dam was having some sedimentation problems. And obviously, I can illustrate in a very logical way. A straight, narrow river flows quicker than a windy, curvy river. A windy, curvy river has the sedimentation precipitate from the river. And so if the river flows quickly and with more force, it carries the sediment further down and avoids the problem. So certainly, draining the Palo Verde Valley was one of the goals in facilitating that. It was a laudatory goal in keeping with the requirements of the Bureau to manage the river and so forth. But it wasn't the only reason. I have to say, I confess, I regard the sediment stuff as a make-believe. But it wasn't. I mean, I've read the documents. I know that's what they say. But I don't believe that that had much to do with why they were doing it. Are there any questions for me? Well, so the water district got the benefits. And these folks that are bringing this lawsuit, they got the short end of the stick. Well, let me characterize it differently. We have a contract with the federal government to take water for our farms from the Colorado River. By the way, we have number one priority of all the Colorado agencies, the head of metropolitan water district, the head of imperial district, much larger agencies. But because of our first-in-time, first-in-right concept, we have first priority. So we have an obligation to manage that water very carefully. We feed it to our farms in our canal, and then we need to get that water drained from our valley, not only for the benefit of the farmers, but for the benefit of all of those other contractors who have rights to that Colorado River. We can't dam it. We can't retain it. We can't, in other words, use it for any other purpose other than the system. So when you say that it's for the benefit of our farmers to the detriment of these folks, you have to understand something, and that is these folks purchased their land within the last 30 or 40 years after the area was already limited to just being a drain. And in our view, and I may be exceeding the scope of my party's contentions here, but in our view, these folks want something that they never had. They never had was the right to the river, the right to the fast-moving river. And so historically, they looked at this situation and said, well, why do we have this slow-moving situation? Why do we have sandbars? Why do we have weeds and all of this kind of stuff? Somebody did some research and said, Shazam, years ago, the mighty Colorado River ran right in front of our homes. Gosh, somebody must have messed up.  Possibly the federal government did some, failed to properly mitigate and so forth. But from my client's perspective, the system worked well when the river was there. Not ideally, but sufficiently. It works well now because eventually that water makes its way to the river for the users that have other contacts on the river. So we've been dismissed from the case. We no longer have a dog in this fight, but I think it's unfair to characterize that somehow the Bureau took some action for our benefit that created problems for these downstream folks. It was created for the overall management of the river. It was designed to create all sorts of benefits, and these folks never had the river in front of their homes because those homes weren't there when the river was there. I know that addresses some issues that have been raised about riparian rights. My understanding of the law of the river is, as the court has indicated, that the river has been entirely allocated. You cannot put a straw in the Colorado River as an agency or a private party without interfering with other people's rights. And does that implicate your right to enjoy the river in front of your home as a riparian user? That's a very interesting question. May the government and the management of the river say, we think it's more appropriate to, for example, dam this area and dry up the free-flowing river. I don't think that that's the issue that's before the court today, of course, but I think that ultimately the purpose of this federal asset is to be managed for those parties that have rights to the consumptive use of it, and in my view, perhaps not for the folks who say, well, we like to fish and to enjoy the benefits of having the river in front of us when, in fact, the river had moved from their neighborhood nearly 50 years ago, and whatever enjoyment they had could have had preexisted their use of their property, in my view. So if you have questions about other operations in the river, I can help. Somebody says, how long have those homes been there? Well, my understanding is that they weren't there 50 years ago, and you can go out there. Those homes are certainly not there years ago when the river was moved, and there were some squatters. There were some landholders out there and so forth, but these folks, in my view, are complaining about a very natural condition. When you take the river away and you devote it to wildlife conservation and use, you basically have said there are some societal values, preservation of fisheries and laying areas for fish, breeding for birds and other wildlife that could not exist in an area of a narrow, fast-moving river channel. You want that slow-moving river. You want the swampy areas. You want the grasslands. Those are serving some significant goals. Now, there's a dispute among these parties as to whether those were ultimately accomplished in light of the ultimate design, the original design, but from our perspective, the drainage system works now, as it has in the past, sufficiently to drain our area, and so it may not serve these folks' environmental concerns, but they talk about issues of environment and so forth, but I think what they really want is the benefits of the fast-moving river that will provide them with recreational uses that are acknowledged severely limited at this time. The sand builds up and the weeds build up and they can't get their boats out and other wildlife gets trapped and died. Nature is not a pretty process. Nature is wild and unpredictable and all of those types of things. In essence, that's what you have now as opposed to a narrow, fast-moving river channel that existed 50 years ago. Well, but nature didn't change all that. Man changed all that. That's right, and basically it's now being restored to what nature is now providing. Well, nature came into this 50 years ago, according to what you've told us. Right. And so none of these homes were there 50 years ago. Well, my understanding is that these people are relatively new homeowners along a purchased property on a drain that served a specific use. It drained the Palo Verde Valley and the surrounding areas and it provided natural wildlife mitigation habitat for the Cibola Wildlife Preserve. Whether those benefits would exist if the river was somehow moved back is anyone's guess, but that is a very big and frankly, my client, if the river came back, we'd still drain our drains into the river, just at a different location. But we're miles away from this outfall drain. The actual jurisdiction of our boundaries of our district are a significant distance away from this location. Before the Cibola Cut was put in, where did you folks drain? In essence, at the same location just a little further to the north. We drained into the same channel, if you will. Prior to this, the river was there. Now, the river is not there. And by the way, let me speak to an issue before I sit down, please. It was very important. The opposing counsel and perhaps the court is under the misapprehension as to the water quality of that outfall drain. The water quality of the outfall drain is very good. We get it tested by regional water quality all the time. And we've never been cited for any sort of violations. Why? Because it travels a great distance from our farms. Our farmers act responsibly in the application of various chemicals and pesticides. We never had any claim that the components of chemicals or other substances in the outfall drain violated any sort of water quality issues. The problem, of course, is that it's muddy. It's full of silt by the time that it gets down because the water spreads out. It's not in a narrow channel. It's slow flowing. And back to my earlier point of the precipitation, it's muddy, but it's not contaminated, if you will, with any known contaminants that I'm aware of whatsoever. So it may not serve their needs because it's shallow and muddy. I object strongly to any characterization that there's any sort of contaminants in violation of any regulation that we're aware of. Thank you. All right. Thank you. I know I may have exceeded my original time. If I may have five minutes for rebuttal. Sure. I'll take at least the irrigation district's last comment, and then I'll proceed to some of the points made by Federal Defendant's Counsel. But the Tullabirdie irrigation drain, this whole stretch, 13-mile stretch, is listed as an impaired water body under Clean Water Act Section 303. So counsel's wrong as far as its impairment levels. But this isn't a water quality case per se. It wasn't brought into the Clean Water Act. We're not looking at irrigation drainage or NPDES permits and the like. But water flow does affect water quality. So let's back up and go to Federal Counsel's point that this was never part of the plan. I'd like to focus the Court's attention to their administrative record, but it's spelled out very clearly in Appellant's Brief. The reply brief, pages 19 and 20, and the opening brief, page 11, is where there's some comments and quotes as well. But starting with the inception of the plan on page 19 of the reply, that's the opening brief. I have this flip-flopped. Page 19 of the opening brief, we have the comments by the Secretary of the Interior or the Secretary of the Bureau. And this is, I'm transmitting the subject report for review and approval for the proposed construction of the specific facilities to integrate the Fish and Wildlife Conservation Program with the water resource development as authorized under the law. This was part, and on the next page, it talks about the concurrence. After a review and the consultations with the Fish and Wildlife Service and input and concurrence from the states of Arizona and California, this is our plan and report. To say they're never part of a plan and that Appellant is making these things up is completely inaccurate. We look to page 11 in the reply brief, where it dispels federal defendants' other comments, that there was no intent to get any fresh water in this area. It was going to be 100% relegated as a drain. Where are you on page 11? Page 11, I'll start up at the second bullet point, perhaps, where it talks about, this is a quote from the administrative record, excerpts of record at page 223, the formation of two new permanent water bodies in the old river channel, the installation of controlled outflow structures for fish management purposes, and fresh water inlets to prevent stagnation. Yeah, but that's one big noun phrase. Where's the verb? That doesn't tell me what you're doing with those nouns. The point being, Your Honor, is that fresh water was intended to be brought into this area. And if we go further down to the fourth bullet point on this page 11, construction of control works with assurance of adequate water inflow could save water wildlife as well as fishery values in Cibola and Three Fingers Lake. Let me ask you this. The government lawyer, I'm sorry, Mr. Drickey, said that everyone understood from the beginning that the Colorado River was going to be diverted in its entirety into the Cibola Cut, and that the only water coming through the old river course was going to be coming down from the drain. Is that correct? That is not correct, not 100%. And what's the, you say not 100%. So, I don't know what percentage is not true, and tell me where I can find, where you say it's not, where I can find that it's not true. Yes, Your Honor. I've been attempting to quote from page 11 places on the record where they were talking, where the government is talking about the inflow of water. There's also another quote. Yeah, but from those little bullet quotes, I can't tell inflow from where. It says fresh water. Well, the stuff coming down from the Palo Verde's irrigation district is fresh water. It's not fresh water. Well, it's not salt water. It's not salt water. Correct. So, this isn't what they're referring to. If we review the record and what the agency is talking about in the administrative record, these quotes are talking about fresh water inlets from the Cibola Cut to get into this area. There's other quotes and other points in the record that are talking about the minimum inlets of 50 CFS. I think it's where I got that quote from. So, there's a number of aspects. The Fish and Wildlife Mitigation Measures themselves talk about the circulation of water to keep these resource areas in usable, fishable, swimmable, boatable form. So, if you look to the project, the intent and purpose of the project, the way it was incorporated into the plan and that there was discussion in the record about how the provision of this water is a non-consumptive basis. Also, there's statements in the record. The provision of this water is water rights that was already there for this area. So, therefore, it's non-allocative. There was the debate that went on. And the ultimate determination in the comprehensive plan is that we're not giving this area any water that it didn't already have. It's allowed to flow through and be through there. It's not a consumptive, for lack of a better word, and it's not an allocative Colorado River water user situation. The next point I wanted to discuss was Reclamation Act, Section 8. Counsel for Federal Defendants, Mr. Sturkey, mentions that. Look, there's no mandatory duty under Reclamation Act, Section 8. And that's just not the case. First of all, that defies this court's ruling in NRDC v. Houston and the district court case NRDC v. Patterson. And that is an agricultural water user case. And the mandatory duty under Fish and Game Code 5937 was to let sufficient water remain in the areas for suitability for fish. It doesn't say how much. Is that not discreet enough to know whether a fish can die or live if there's just enough water? The expert testimony, as this record plays out, whatever resource conservation for fisheries and some semblance of usable water, which this project was to maintain, the conditions are now that fish are dying, plants, we have a eutrophication situation, and that's just where it's getting so stagnant and superheated that fish can't live. That's the current conditions. That's not fish and wildlife conservation measures. That's death of a river. And it's when that came to clear the tension, to be an actionable claim that they're not doing anything, they're disclaiming jurisdiction and responsibility. We have a situation with the Irrigation District. This record, I'm not sure the right adjective to put on it. There's an agreement that came up in this record when appellate did its FOIA, its Freedom of Information Act request that came up prior to suit to see that they're not all their obligations, but a 1977 agreement between the agencies that PVID can do what it wants in the river without regards to conservation values. In other words, treat it as a grain. It's completely antithesis to what this project is and was supposed to be. And that's a perfect example of, number one, we have the competing jurisdictions between the Palo Verde Irrigation District and Reclamation as to who's to do what there. But the fact of the matter is this is solely being treated as a drain and Reclamation's denying any responsibility or any of the commitments under the plan. Do you know how long the appellants have been in this particular location, how long they've been homeowners along the old river channel? Yes, Your Honor. It's certainly going to change over time as owners come and go. The settlements of Mitchell's Camp and the settlement of Walter's Camp date back to the early 20s, before the time of this project. But to say there wasn't a complaint back at the time the construction was done to say, Shazam, you moved a river. What a surprise. I need to sue now. This project, and this administrator spelled it out too, it was promoted as saying there's going to be a new waterway, we're going to keep these areas open, there's going to be continued boating access, fishery values, they implemented these measures. Nobody had anything to complain about. That's why this case is so different from your failure to act, traditional failure to act in APA cases. We're trying to enforce what is in the plan. As the Supreme Court in Suis stated, if there were measures in the plan to enforce, we could understand it. But these were the commitments. We're not asking for something that wasn't. They wouldn't sue in 1959 or 1970. The problems weren't present. The abdication of responsibility that if you look to how could you sue in 1959 or 1970 when the agency, this record is so clear about the intent of We're going to defer it. There's just innumerable sites. We're not going to give up on the commitments. We're deferring the implementation of them because we overdredge. Let's see if it rectifies itself. I mean, if there isn't more of a situation where a cause of action didn't accrue until you know about it, number one, they said it's not going to. Their actions are, and their statements are, we're intentionally deferring. There's no right to sue back in that time. I believe I hit most of the points I wanted to raise in rebuttal. Is there a document where the Bureau of Reclamation states, this is our plan and this is what we're going to do, and this is how we're going to maintain the project? Yes, John. I would cite to, at least initially, to the commitment of the agency. Oh, yes. One document. One document? Yes. Well, it's the comprehensive plan dated 1959. Well, that's what I just asked. You're going through all of them. You're picking up these points that are in there to convince people that this project is good for everybody. Is that what you're doing? Yes, we present it in the district court. I'm trying to remember if it's in our excerpts of records here. The brochures prepared by the irrigation district showing the beautiful pictures and the advertisement that this is going to open up a new area, voting, access way, how the project was built, and I believe the comprehensive plan states that as well. It starts with the premise, if we don't do anything, this is going to demise access, use, recreation, fisheries. Then you have the commitment, the interagency consultations, state involvement. You come up with the Fish and Wildlife Coordination Act implementation measures, and the project is approved. That's through the federal government. It gets approved by the secretary, and it gets funded by Congress. That's our comprehensive plan. Not necessarily picking and choosing what they said they were going to do. That's the plan. The measures are in there. In this case, we have abandonment. We have non-denial. We have abdication, pointing the fingers with the irrigation district and the Bureau of Reclamation of who's to do what. It's just a drain now. We don't care anymore, and the river's being demised. So that's when and why and how CLEAR brought its claim. Appreciate your time this afternoon. Was anyone representing the homeowners at that time? Not that I'm aware of in this record. But I can almost guarantee you I have met and discussed and are members of this plaintiff's group that were there during the time and could testify as to the conditions, the promises, and how it's gotten to where it is. But they were around during that time. I can attest to that. If I may make one last inquiry as to if Your Honor is interested in a diagram, I believe it would be a considerable task to undertake. If there's interest, certainly from our perspective, be willing to undertake the task and the time to do so, whether this informally may submit one or it's recommended or preferred, I'd like some clarity on that. I think it would be helpful for the parties and perhaps the court. Well, diagrams are helpful if they're accurate. I think the government's going to submit one too. Fair enough. Thank you. And it's going to be submitted. We're going to get something within 30 days. We'll check with counsel and coordinate it and submit it on. All right. This matter is submitted.
judges: Pregerson, Fletcher, Nguyen